IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DIANNA M. MAYNARD                    )
                                     )
v.                                   )    No. 3:06-0988
                                     )    Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION       )


To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge


### REPORT AND RECOMMENDATION

          This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB"), as provided under Title II of the
Social Security Act ("the Act"), as amended.  The case is
currently pending on plaintiff's motion for judgment on the
administrative record and supporting memorandum (Docket Entry No.
16), to which defendant has responded (Docket Entry No. 19).  In
further support of her motion, plaintiff has filed a reply
(Docket Entry No. 20) to defendant's response.  Upon
consideration of these papers and the transcript of the
administrative record, and for the reasons given below, the
undersigned recommends that plaintiff's motion be **DENIED**, and
that the decision of the Commissioner be **AFFIRMED**.

1

# I.  INTRODUCTION

Plaintiff filed her DIB application on March 17, 2003, alleging that she had been disabled since August 1999 due to a combination of impairments (Tr. 49-52, 56).  Plaintiff's application was denied at both the initial and reconsideration stages of agency review (Tr. 36-38, 41-42).  Plaintiff thereafter requested and received a *de novo* hearing before an Administrative Law Judge ("ALJ") on July 21, 2005 (Tr. 333-61).  Plaintiff was represented by her current counsel at the hearing.  After hearing plaintiff's testimony and counsel's remarks, the ALJ took the case under advisement until December 20, 2005, when he issued a written decision (Tr. 15-23) finding plaintiff "not disabled" and denying her application for benefits.  The decision contains the following enumerated findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 2004.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's history of depression, social phobia and posttraumatic stress disorder; history of bilateral carpal tunnel release surgery; history of left distal radius fracture with surgery; history of left ankle fractures (two times); fibromyalgia; lumbar spine degenerative disc disease; chronic Epstein-Barr virus; and right elbow epicondylitis are considered "severe" in combination based on the requirements in Regulations 20 CFR § 404.1520©).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in

2

Appendix 1, Subpart P, Regulation No. 4.  She has no more than mild restrictions of activities of daily living or more than moderate limitation of ability to maintain social functioning or to sustain concentration, persistence, or pace.  She has experienced no episodes of decompensation, and she functions adequately outside of a highly supportive setting.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity:  perform a reduced range of unskilled light work, with lifting of five to ten pounds; sitting occasionally in an eight-hour workday; and standing or walking up to six hours in an eight-hour workday.  In addition, the claimant can perform simple and some detailed tasks over a full workweek in coordination with others; can interact infrequently or one-to-one with the general public and meet basic social demands in a work setting; and can adapt to gradual or infrequent changes.

7.  The claimant's past relevant work as brake technician/assembler did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.  The claimant's medically determinable history of depression, social phobia and posttraumatic stress disorder; history of bilateral carpal tunnel release surgery; history of left distal radius fracture with surgery; history of left ankle fractures (two times); fibromyalgia; lumbar spine degenerative disc disease; chronic Epstein-Barr virus; and right elbow epicondylitis do not prevent the claimant from performing her past relevant work.

9.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

(Tr. 22-23)

    On August 11, 2006, the Appeals Council denied

Case 3:06-cv-00988   Document 21   Filed 02/22/08   Page 3 of 34 PageID #: 96

plaintiff's request for review of the decision of the ALJ (Tr. 4-6), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. REVIEW OF THE RECORD

In her brief, plaintiff essentially concedes that her symptoms from multiple impairments were not of disabling severity prior to July 19, 2002, the date upon which she slipped and fell in her bathtub. (Docket Entry No. 16 at 19). Accordingly, plaintiff's focus and the focus of this report is on the period between July 2002 and December 31, 2004, plaintiff's date last insured. As relevant to this period under consideration here, plaintiff's medical history included bilateral carpal tunnel release surgeries performed by Dr. Rodger Zwemer (Tr. 186-88), which were largely successful in resolving plaintiff's carpal tunnel symptoms. Other notable developments prior to July 2002 included a finding of degenerative disc disease in the thoracic spine and treatment of plaintiff's complaints related to bilateral heel spurs (Tr. 175-77), as well as treatment by Dr. Jim E. Jenkins for plaintiff's symptoms of depression and

4

gastroesophageal reflux disease ("GERD") (Tr. 136-55). The following review of the relevant period, taken from plaintiff's brief (Docket Entry No. 16 at 5-18), is categorized by source of the medical treatment provided.

### McMinnville Orthopaedic Clinic

On July 19, 2002, the treatment notes reveal that plaintiff had slipped and fallen in the bathtub, landing on her right chest, for which Dr. Zwemer prescribed the painkiller Vicoprofen. (Tr. 175). Thereafter, plaintiff's orthopaedic care was provided by Dr. Douglas B. Haynes, a physician in practice with Dr. Zwemer.

The next day she was involved in an automobile accident. On August 15, 2002, plaintiff was treated by Dr. Haynes for severe pain in her left foot resulting from the accident. She was placed in a removable cast walker and scheduled for a bone scan. (Tr. 174).

On August 22, 2002, Dr. Haynes noted that she was still having pain in her chest and in her ankle, although they were better. He felt she had sustained a strain of the left foot and may have had a nondisplaced fracture of the sternum. She was prescribed Darvocet-N 100 and was given an ASO ankle brace. (Tr. 174).

At the visit on September 16, 2002, her complaints were pain in her back and down into her hips for a couple of weeks.

5

The ankle was improved, but her chest still had some mild tenderness over the sternum with mild pain on AP and lateral compression of the chest. Dr. Haynes made a diagnosis of lumbar strain and prescribed a Medrol Dosepak and Soma. (Tr. 173).

The plaintiff returned on September 30, 2002, still complaining of back problems, reinjury to her ankle, increased problems since the accident in her left hand, with numbness in her thumb, ring and small fingers. She was prescribed pain medications. (Tr. 173).

She returned to the clinic on October 10, 2002, stating her foot was giving her the biggest problem; that her chest was better; and her back was better except when she wore the large brace. X-rays were repeated of the foot and were felt to show what appeared to be a small nondisplaced fracture of the cuboid. An MRI was reviewed of the back that showed degenerative disc disease with degenerative spinal stenosis. (Tr. 172).

On the next visit on October 24, 2002, plaintiff's foot was better, however, she had injured her right shoulder while attempting to start doing some exercises. Her foot was still tender over the cuboid. Her shoulder was tender on the media border of the scapula. She was prescribed shoulder shrug exercises and instructed to wear the small brace on her foot. (Tr. 172).

The next visit of November 14, 2002, revealed a little

6

stiffness in her foot and continuing problems with her back, aggravated by digging a small drainage ditch. There was mild tenderness in the upper border of the trapezius on the right and the paraspinal muscles in the lumbar region. Dr. Haynes expressed his opinion that her foot pain was a direct result of the motor vehicle accident. (Tr. 172).

At the December 13, 2002 visit, her back continued to give her problems, but her foot was causing very little difficulty. She had tried to do her housecleaning, but it had caused discomfort. Dr. Haynes placed her on Bextra and noted that several different treatment modalities were to be tried, including physical therapy, exercise, anti-inflammatory medications, and a TENS unit. (Tr. 171).

On January 10, 2003, it was noted that the plaintiff continued to have pain in her back radiating into her leg. She was on exercises, going to physical therapy, taking Bextra and using a TENS unit. There was tenderness in the low back diffusely and complaints with numbness, pain and weakness in both hands. (Tr. 170).

The visit on January 31, 2003, revealed continuing discomfort in her back in spite of the different treatment modalities. She had also had EMG's and nerve conduction velocities on both hands that showed some bilateral mild carpal tunnel syndrome. (Tr. 169).

7

On February 19, 2003, the plaintiff was complaining of buttock pain after a fall on the ice on stairs. She had a normal gait pattern but slow and steady secondary to discomfort. Her active range of motion was decreased secondary to discomfort. She was prescribed a soft donut, a short course of pain medicine and muscle relaxant and simple exercise program for her low back to prevent stiffness and to speed recovery. (Tr. 168).

A prescription was called in to Kroger on March 10, 2003, for a refill on Lortab and Ultracet. (Tr. 168).

She returned to the clinic on March 13, 2003, for checkup on her coccyx, which revealed she was quite tender over the terminal coccygeal segments. She was again prescribed pain medication and was told that, unfortunately, there was really not much to do at that point. (Tr. 167).

At the April 18, 2003, visit her coccydynia was much better, but she was having pain in her low back. She was injected at the trigger points and told to continue the TENS unit with a prescription for Propoxyphene and Lortab 7.5, with a diagnosis of "low back 724.5" by Dr. Haynes. (Tr. 166).

The medical records show the September 10, 2003, visit to Dr. Haynes to be primarily for her hands. (Tr. 291).

Then on September 12, 2003, she returned to Dr. Haynes complaining of pain, tenderness, and discomfort in her right thoracic area. He could palpate a little muscle spasm. He

8

recommended moist heat and stretching exercises. (Tr. 291).

The next visit to Dr. Haynes was on January 19, 2004, when she was assessed as having: (1) comminuted intra-articular fracture, left distal radius; (2) soft tissue injury, left knee; and (3) soft tissue cervical spine injury. He planned to put an external fixator on the left wrist once her knee, cervical spine and face had been cleared. He gave her a knee immobilizer for the right knee. (Tr. 290).

On January 23, 2004, she returned after having external fixator placed on her left wrist on January 21, 2004. (Tr. 290).

She returned to Dr. Haynes on January 30, 2004. He stated the incisions looked quite good, and x-rays showed excellent position of the wrist. She was continuing to have pain in the right knee and had a large hematoma in the prepatellar bursa. She also had face tenderness over the inferior orbital rim and was having some pain in her back. (Tr. 289).

On February 5, 2004, she returned to the clinic, stating her wrist was doing well and that her right knee continued to swell. Dr. Haynes found fairly good motion at the MP and IP joints and that the knee had a large prepatellar bursal hematoma. He incised and evacuated the hematoma and prescribed antibiotics. (Tr. 289).

The next visit to Dr. Haynes was on February 13, 2004, for followup on her knee, wrist and cervical spine injuries. Her

9

knee was doing well and having very little drainage.  She was
working on motion of her wrist, but she was tender over the ulnar
styloid.  Her cervical spine was still sore as was her low back.
On exam, there was a prominence of the distal ulna and fairly
good motion of the MP and IP joints.  Her back had limited motion
both in the lumbar and cervical spine.  She was given exercises
for her neck and low back and prescribed Lortab 10.  (Tr. 288).

On March 2, 2004, she reported her knee was doing
fairly well, with some pain in the peripatellar region on getting
up and going up and down stairs.  She was tender over the medial
aspect of the knee, but she had good motion with no instability
or spasm.  Her neck was causing very little problems, but her low
back was still causing some discomfort and was tender in that
region.  Further, she was having problems with her right wrist
and was tender over the radial styloid.  The fixator was removed,
and she was placed in a removable wrist splint for both wrists.
(Tr. 288).

At the time of the March 12, 2004, visit the plaintiff
had again fallen and reinjured her wrist, as well as her left
knee.  There was an abrasion on her left knee.  The left wrist
had limited motion with tenderness and swelling.  (Tr. 288).

She returned on March 26, 2004, when her wrist was
improving, however, flexion and extension, as well as radial and
ulnar deviation, were still mildly limited.  She was advised that

10

she may need resection of the distal ulna and at that point they would work on motion. Another problem was pain in her right elbow, which showed tenderness over the lateral epicondyle. She was prescribed a tennis elbow brace. (Tr. 287).

On April 20, 2004, she returned to Dr. Haynes having difficulty using her arm. She had good supination and pronation, although this was painful. Her motion was much improved, but she was still slightly stiff at the MP joints. X-rays showed post-traumatic arthritis in the wrist. Recommendation was made for resection of the distal ulna, which was performed.

She returned for followup on her wrist on May 10, 2004, when she was placed in a removable wrist splint and told she could use her wrist as desired. She was also having problems with her right elbow, for which she was injected. (Tr. 286).

On May 25, 2004, she had followup of her left wrist. Her motion was limited. The sutures were removed, and she was encouraged to use her hand. (Tr. 286).

The next visit was on July 22, 2004, when her wrist was doing fairly well. She was able to use it but not able to do any heavy lifting. She was having a lot of pain in her back. It was noted she had been struck in the back with a shopping cart by another person some seven weeks prior. She had post-traumatic arthritis in her wrist and was told that was something she would have to live with. The thoracic spine motion was minimally

11

limited, and the lumbar spine motion was limited in extension and lateral flexion. Forward flexion was quite good. X-rays were reviewed, which were felt to show some straightening of the cervical spine. The lumbar spine appeared to show a spondylolisthesis at L5-S1. She was prescribed Lortab and Soma. (Tr. 285).

On August 17, 2004, plaintiff returned to Dr. Haynes for followup of the fracture of her distal radius and her back and elbow pain. On exam there was good motion in supination and pronation. Flexion and extension were mildly limited. There was some swelling over the distal ulna. X-rays showed good healing of the fracture. With respect to her back, she had some discomfort and related this was due to the weather change. She had had her CT scan, and Dr. Haynes reviewed this, which confirmed a pars defect bilaterally. Her elbow had done quite well after injection but the pain was returning. She was tender over the lateral epicondyle. She still had her tennis elbow brace. (Tr. 285).

At the visit on August 30, 2004, the plaintiff returned to the clinic stating she had recently slipped in the bathtub and injured her low back and her left wrist. On exam the wrist had good motion but was mildly painful and some slight swelling ulnarly. The low back had limited motion and tenderness in the midline. The assessment was an aggravation of her previous screw

12

site to the left wrist and a lumbar strain.  (Tr. 284).

The next visit to the clinic was on October 5, 2004, when the plaintiff stated her wrist was better but she was still experiencing some discomfort.  She still had limited motion with no instability, spasm or atrophy.   Supination and pronation revealed some crepitance.  Dr. Haynes advised her she could begin leaving off her brace.  She was given a prescription for some pain medication.  (Tr. 284).

There appears in the record notes on October 15 and 19, 2004, and November 5, 2004, indicating prescriptions for pain medications.  (Tr. 284).

On November 11, 2004, plaintiff returned to the clinic stating her wrist was doing quite well, however, she was having pain in her right elbow again.  She was point tender over the lateral epicondyle, and an injection was made.  Also, she still had low back pain, for which she received some trigger points injections.  (Tr. 283).

On November 15, 2004, plaintiff apparently called for pain medication, and a prescription was apparently called in the next day.  (Tr. 283).

The next visit was on January 11, 2005, 11 days after the date last insured.  The plaintiff was then having problems with her left wrist, both knees and her cervical spine.  (Tr. 282).

13

Plaintiff continued to follow up with Dr. Haynes, and she continued to have problems with her wrists. Dr. Haynes stated on March 31, 2005, that she was very well known to have degenerative change and a resection of the distal ulna. She continued to have problems with the right elbow. This record reveals that she was limited to five pounds lifting with the left arm and no repetitive work for both arms. (Tr. 281).

### Dr. Jim E. Jenkins

Plaintiff was followed by Dr. Jenkins from 1997 through August 19, 2002. (See Ex. 1F (Tr. 133-155)).

Prior to her amended onset date of August 24, 1999, Dr. Jenkins had treated the plaintiff for depression, GERD, gastritis and helicobacter. On June 25, 1999, he recommended counseling or psychiatric assessment, to which she was not amenable. (Tr. 140).

On July 23, 1999, he had kept her off from work another week, indicating that her depression had improved. (Tr. 139).

Dr. Jenkins again saw her August 20, 1999, when he stated her feeling of depression was fairly well resolved. (Tr. 138).

The next note from Dr. Jenkins was May 24, 2000, when the plaintiff returned complaining of recurring mild depression. (Tr. 137).

The last visit was August 19, 2002, when the plaintiff

14

was complaining of reflux symptoms manifested by heartburn but no epigastric discomfort, and stating she had experienced similar problems in the past. The note indicates she had undergone previous antibiotic treatment for helicobacter and that she was recently in a MVA, for which she was being followed by Dr. Haynes. The impression was "GERD." (Tr. 136).

### Dr. Jimmie Woodlee

The first indication of treatment by Dr. Woodlee was August 6, 2003, when plaintiff complained of cough, congestion, wheezing, headache, and a tight chest. His assessment on that occasion was: (1) bronchitis with bronchospasm; (2) gastritis; (3) history of asthma; (4) smoker; (5) history of sleep disorder; (6) history of depression in the past; and (7) recent general anesthesia for D & C. (Tr. 236).

She was then seen on the following day, August 7, 2003, with essentially the same complaints. (Tr. 2325).

The next visit was August 11, 2003, for recheck, when she was assessed as having persistent bronchitis with bronchospastic cough. (Tr. 234).

On August 25, 2003, she returned still complaining of being sick with severe coughing (so much that it hurt her side and back) and bronchitis. The assessment on that date was: bronchitis with slow resolution with persistent cough and multiple diagnoses as above (referring to asthma, sleep disorder,

15

depression, recent general anesthesia for D & C). (Tr. 232).

On September 10, 2003, plaintiff underwent an abdominal ultrasound that revealed: (1) cholelithiasis; (2) mild fatty liver infiltration; and (3) prominent left kidney without focal abnormality. (Tr. 251). At that visit she was assessed with resolving bronchitis with persistent cough, abdominal pain, smoker, history asthma, sleep disorder, history of depression and history of carpal tunnel. (Tr. 230).

Then on September 15, 2003, there was a report to Dr. Woodlee concerning an abdominal exam. (Tr. 250).

On September 16, 2003, plaintiff underwent laparoscopic cholecystectomy, total abdominal hysterectomy, bilateral salpingo-oophorectomy at the River Park Hospital in McMinnville, with Dr. Woodlee being listed as one of her physicians. (Tr. 245).

X-ray of the chest was made on October 2, 2003, which revealed no evidence of active chest disease. She had complaints of cough and dyspnea and was diagnosed with bronchitis, with the assessment being essentially the same and a notation of recent hysterectomy and gallbladder surgery. (Tr. 229).

On October 30, 2003, plaintiff was complaining of fatigue, headache, trouble sleeping, depression, aching and nervousness. (Tr. 229).

Then on October 30 and 31, 2003, Dr. Woodlee did tests.

16

It was one of these tests that revealed the Epstein-Barr virus and that her Vitamin B12 was elevated. (Tr. 228, 240, 241).

She was again seen by Dr. Woodlee on November 4, 2003, regarding her use of Paxil. (Tr. 228).

Plaintiff was seen on December 1, 2003, with an assessment remaining essentially the same except anxiety and obesity were added to the list. (Tr. 227).

The next day, December 2, 2003, plaintiff reported that Xanax was not working, and that she was crying all day. Her prescription was changed to Wellbutrin. (Tr. 227).

Again, on December 8, 2003, plaintiff reported as "coughing a lot," for which she was given a prescription. (Tr. 227).

Then on December 23, 2003, she was again seen with an assessment:

1. Musculoskeletal pain probably fibromyalgia.
2. History of carpal tunnel.
3. History of hysterectomy and gallbladder removal.
4. Depression.
5. Anxiety.
6. Bronchitis.
7. Heartburn and indigestion.
8. Tobacco abuse.
9. Obesity.
10. History of asthma.
11. Return if problems develop.

(Tr. 226).

On January 20, 2004, the assessment by Dr. Woodlee was:

1. Fracture left radius, surgery tomorrow Dr. Haynes.
2. Right knee pain, strain. Follow up with Dr. Haynes

17

```
            regarding this.
        3.  Contusion right orbit.
        4.  Obesity, continue Adipex 2 hours after meals.  Re-
            check weight in 4 weeks.
        5.  History of asthma.
        6.  Anxiety.
        7.  Depression, continue Celexa.
        8.  Carpal tunnel syndrome.
        9.  Fibromyalgia.
       10.  Return if problems develop.
```

(Tr. 272).

Then on February 17, 2004, the plaintiff was diagnosed with obesity, stable asthma, anxiety and depression, history of carpal tunnel, fibromyalgia, a healing fracture of the left radius, sinusitis, and pharyngitis.  (Tr. 271).

On March 16, 2004, the assessment was essentially the same.  (Tr. 270).

On March 24, 2004, Dr. Woodlee referred the plaintiff for counseling for her depression with April Rummage.  (Tr. 270).

Plaintiff was seen again on April 2, 2004, apparently for upper respiratory problems, and then on April 13, 2004, for a stomach virus and congestion.  (Tr. 268-270).

On April 13, 2004, the assessment was:

```
        1.  Gastroenteritis.
        2.  Bronchitis/sinusitis.
        3.  Anxiety and depression.
        4.  History of carpal tunnel syndrome.
        5.  Fibromyalgia.
        6.  Healing fracture of the left radius.
        7.  Obesity.
        8.  Sleep walking.
        9.  Return in 4 weeks for recheck.
```

(Tr. 268).

The April 16, 2004, visit concerned medications. (Tr. 267).

The May 27, 2004, assessment was essentially the same, and the July 13, 2004, visit was relative to medications. (Tr. 265).

On August 3, 2004, the plaintiff had a pulled muscle, upper respiratory problems, a sinus headache and had chronic aching from fibromyalgia in her knees, ankles, back and hips. Her depression appeared to be doing better. (Tr. 263).

The August 10, 26 and September 14, 2004, notes concerned her medications (Tr. 262, 263).

On September 20, 2004, her problem list consisted of: chronic bronchitis, smoker, depression, multiple diagnoses that included multiple surgeries, gastritis, carpal tunnel syndrome, asthma, sleep disorder, depression, fibromyalgia, chronic fatigue syndrome, Epstein-Barr virus, obesity and chronic cigarette abuse, and chronic pain syndrome. She was encouraged to start a physical exercise program. (Tr. 261).

The September 23 and October 15 and 25, 2004, notes concern medications. (Tr. 259).

The plaintiff had a pulled muscle in her back on November 4, 2004. (Tr. 259).

The November 23 and December 6, 2004, notes concern refills of medications. (Tr. 259).

19

Notes from December 17, 2004, January 18, 2005, and March 25, 2005, all concern plaintiff's medications. (Tr. 258).

### Dr. J. Thomas John, Jr.

On March 11, 2004, Dr. John, a rheumatologist, evaluated the plaintiff in connection with her fibromyalgia and recommended Top Rehab, water exercise and to cease smoking. (Tr. 323). There are no records of any followup by Dr. John, nor of any followup by plaintiff of his recommendations.


### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Sec'y of Health & Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401

20

(1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  <u>Hurst v. Sec'y of Health & Human Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of

21

the "listed" impairments[1] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4)    If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5)    Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to

_____

[1]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

22

perform specific jobs, which is typically obtained through vocational expert (VE) testimony.  See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

As plaintiff suggests in her brief, the myriad of accidental injuries she has suffered significantly lessened her quality of life during the period under review here.  Plaintiff testified that she first began to be bothered by her impairments in 1998 (Tr. 339), though after having first alleged disability commencing in August 1999, she now argues that her combination of impairments became totally disabling after she fell in the bathtub on July 19, 2002 (Docket Entry No. 16 at 19).  However, as plaintiff also recognizes, "[s]ince [she] suffers from both fibromyalgia and Epstein-Barr virus [("EBV")], it is most likely that this is the reason she was not able to continue working." (Id. at 19-20; see Tr. 345-46 (ranking her impairments in descending order as they contribute to her inability to work: (1) fibromyalgia and EBV, (2) her back, (3) her arms, and (4) her

23

nerves/depression))  Thus, the focus of plaintiff's arguments before this Court is that her chronic pain and fatigue resulting from these conditions were improperly analyzed by the ALJ, who found that plaintiff retained the ability to engage in a reduced range of light work, despite her treating physician's opinion to the contrary.

As an initial matter, plaintiff argues that the ALJ erred in finding her capable of returning to her past relevant work as a brake technician/assembler, in the absence of vocational expert testimony and despite the fact that the only vocational assessment of record determined that plaintiff could not return to her past relevant work (Tr. 100).  However, the vocational specialist assessment obtained during state agency review did not consider plaintiff's brake technician/assembler job among her past relevant jobs, since plaintiff's paperwork included all duties performed at the auto parts technician job she held from 1989 to 1999 in one job description, which appears to have drawn from her experiences on several different assembly lines (See Tr. 57 ("For about 2 years I made rear suspensions.  I loaded it into 8 different robots.  I walked about 20 yards 300-350 times in 8 hours."), 75-76).  However, plaintiff testified at her hearing that her duties on the brake pedal assembly line, which she performed for at least a year and a half, were significantly easier than those in other parts of the automobile

parts factory (Tr. 343-45). Pursuant to Social Security Ruling 82-62, "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level[,] exertional demands and nonexertional demands of such work." 1982 WL 31386, at *3 (S.S.A.). Accordingly, the undersigned finds no error in the ALJ's determination that plaintiff's past relevant work includes her job as a brake technician/assembler, and that the demands of that job accommodate her assessed residual functional capacity.

As to plaintiff's RFC itself, the main problem with plaintiff's arguments concerning the severity of her pain and fatigue from fibromyalgia and EBV is the paucity of medical evidence which addresses the treatment of these symptoms. Although Dr. Haynes is plaintiff's treating orthopaedist, and is the physician whose July 2005 RFC assessment is relied upon by plaintiff to support her claim of disability prior to December 31, 2004, it does not appear that he treated plaintiff's fibromyalgia as such, though his assessment cites fibromyalgia as one of the bases for the sitting, postural, and manipulative restrictions assigned therein (Tr. 326-27). Rather, plaintiff was diagnosed with fibromyalgia and EBV by Dr. Woodlee, her primary care physician, whose notes reveal that plaintiff complained of musculoskeletal pain "all over in her back,

25

shoulders, knees, ankles and hips" (Tr. 274), for which she was prescribed the narcotic painkiller Lortab, in 5 milligram doses. A few months later, Dr. Woodlee responded to plaintiff's complaint of "a lot" of fibromyalgia pain by increasing the Lortab dosage to 7.5 milligrams (Tr. 270). Dr. Woodlee changed plaintiff's pain medication to a different narcotic, Talwin Nx, in October 2004, and added the muscle relaxant Soma to address a pulled muscle in plaintiff's back in November 2004, but thereafter deferred to Dr. Haynes for the treatment of plaintiff's pain complaints (Tr. 259). Dr. Haynes appears to have continued the Soma in December 2004, while changing plaintiff's pain medication to Percocet, another narcotic agent. (Id.)

In September 2004, plaintiff was "highly encouraged to start physical therapy for fibromyalgia or at least an exercise program, stop smoking, appropriate diet." (Tr. 261) The lone rheumatology consultation in the record also included a referral to therapeutic exercise and the recommendation to stop smoking (Tr. 323-24), though as the ALJ noted, there is no indication that plaintiff ever followed through with the referral to physical therapy or other rehabilitation (Tr. 20). The rheumatologist, Dr. John, also noted plaintiff's allergy to several nonsteroidal anti-inflammatory drugs, the mild narcotic Darvocet, sulfa drugs, and Motrin (ibuprofen). (Tr. 323) It

26

appears that any treatment directed to plaintiff's EBV is limited to addressing the associated symptoms that it perhaps shares with plaintiff's other impairments, as there is very little discussion of EBV in the medical evidence of record.

As detailed in defendant's brief (Docket Entry No. 19 at 7-8), substantial medical evidence supports the ALJ's finding that plaintiff did not suffer enduring, disabling limitations due to severe pain or other consequences of plaintiff's accident-related impairments. In particular, Dr. Haynes's notes from mid-2002 through early 2003 (Tr. 169-74) do not support the limitations he assessed in 2005, as those notes generally contain findings upon examination that are less than significant (vis-à-vis plaintiff's ability to return to the workforce), as well as the conclusion that no further treatment is required for plaintiff's carpal tunnel and ankle impairments[2] (Tr. 169, 173). Because Dr. Haynes's assessment is inconsistent with his own treatment records and the prior assessment of Dr. Fisher, the ALJ was not bound to give controlling weight to the opinion of Dr. Haynes.[3]  E.g., Bogle v. Sullivan, 998 F.2d 342, 347-48 (6th Cir.

_____

[2]As noted by the ALJ, plaintiff's left ankle injuries in February and April 2005, as well as the recurrent right elbow pain documented in 2005, occurred after the expiration of her insured period and are thus beyond the scope of her benefits application.

[3]The undersigned notes that, had Dr. Haynes's assessment been clinically supported by the records of his treatment of plaintiff, the government's attempt to discredit the assessment because it is expressed on a "form report" that utilizes check-boxes (Docket Entry No. 19 at 16) would be entirely unpersuasive.  In this regard, such assessments by treating sources are due no

27

1993).

However, the government's attempt to refute the severity of plaintiff's alleged fibromyalgia pain by reference to the consultative report of Dr. Fisher and that of the nonexamining consultant Dr. Millis (Docket Entry No. 19 at 9-10) is misplaced, inasmuch as plaintiff had not even been diagnosed with that impairment at the time that those physicians reviewed her records or examined her.  Rather, the undersigned must conclude that plaintiff's proof simply fails to sufficiently document the existence of a disabling level of impairment, by failing to show any extensive measures taken by either plaintiff's physicians or plaintiff herself to combat her symptoms of fibromyalgia.  Though plaintiff was consistently prescribed narcotic pain medication, this course of treatment appears to have produced satisfactory results during the period

---

less weight than the assessments of the state agency consultants whom defendant heralds as "highly qualified ... experts" whose check-box opinions are "appropriately considered" in the disability analysis.  (Id. at 10) Furthermore, the Commissioner's own ruling rebuts the argument (id. at 16) that Dr. Haynes's status as a treating physician is irrelevant to the subject of plaintiff's RFC; defendant appears to have confused the administrative finding of RFC (here, a reduced range of light work) with the medical concerns which inform it.  See Soc. Sec. Rul. 96-5p, 1996 WL 374183, at *4-5 (S.S.A. July 2, 1996)("Medical source statements submitted by treating sources provide medical opinions which are entitled to special significance and may be entitled to controlling weight on issues concerning the nature and severity of the individual's impairment(s). ... Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment.").  Had Dr. Haynes opined that plaintiff could perform only sedentary work, his treating source status would have no bearing on the legitimacy of that opinion, but it obviously does bear on the legitimacy of his opinion, inter alia, that plaintiff cannot lift more than five pounds occasionally.

at issue, as no further consultation with a rheumatologist or other specialist was pursued, and plaintiff did not follow through with recommendations for physical therapy and other lifestyle modifications. The ALJ's decision is consistent with the view that, prior to December 31, 2004, plaintiff's fibromyalgia and EBV symptoms were not proven to be of disabling severity or chronicity, but were shown to be sufficiently severe to reduce the otherwise substantially supported assessment by consulting Dr. Fisher of plaintiff's work-related lifting abilities. (Tr. 20, 21)

Although plaintiff argues that the ALJ did not properly consider the nonmedical evidence in support of her subjective pain and fatigue complaints, the ALJ considered plaintiff's complaints to be largely undermined by his finding of her poor credibility. It is well established that an ALJ may properly consider the credibility of a claimant when making his disability determination, and that this credibility finding is due great weight and deference in light of the ALJ's opportunity to observe the claimant's demeanor while testifying. <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 476 (6th Cir. 2003). There is likewise no question that a claimant's subjective complaints can support a finding of disability--irrespective of the credibility of that claimant's statements--if they are grounded in an objectively established, underlying medical condition and are borne out by

29

the medical and other evidence of record. 20 C.F.R. §
404.1529©))[4]; e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525,
531 (6th Cir. 1997); Social Security Ruling 96-7p, 1996 WL
362209, 61 Fed. Reg. 34483, at *34484-34485 (describing the scope
of the analysis as including "the medical signs and laboratory
findings, the individual's own statements about the symptoms, any
statements and other information provided by treating or
examining physicians or psychologists or other persons about the
symptoms and how they affect the individual, and any other
relevant evidence in the case record"; "[A] finding that an
individual's statements are not credible, or not wholly credible,
is not in itself sufficient to establish that the individual is
not disabled.").

In considering the ALJ's finding on the weight of

---

[4]Section 404.1529(c) provides that, "[w]hen the medical signs or
laboratory findings show that you have a medically determinable impairment(s)
that could reasonably be expected to produce your symptoms, such as pain," the
entire record of medical and nonmedical evidence will be considered in
evaluating the intensity and persistence of those symptoms, including the
following factors:
    (i) Your daily activities;
    (ii) The location, duration, frequency, and intensity of your pain or
other symptoms;
    (iii) Precipitating and aggravating factors;
    (iv) The type, dosage, effectiveness, and side effects of any medication
you take or have taken to alleviate your pain or other symptoms;
    (v) Treatment, other than medication, you receive or have received for
relief of your pain or other symptoms;
    (vi) Any measures you use of have used to relieve your pain or other
symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every
hour, sleeping on a board, etc.); and
    (vii) Other factors concerning your functional limitations and
restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

plaintiff's subjective complaints, this Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [plaintiff] are reasonable and supported by substantial evidence in the record." Jones, 336 F.3d at 476. The ALJ gave the following explanation of his adverse credibility finding:

> The [ALJ] finds the claimant's allegations regarding her limitations less than fully credible. While I have no doubt that she experienced some level of pain and discomfort due to her multiple impairments, such has not been shown to be more than mild to moderate or to have produced disabling functional limitations for any continuous twelve month period relevant to this decision. There are a number of contradictions which detract from the claimant's credibility. She testified that she did very little around the house and would lie down most of the time. This is contradicted by treatment notes indicating that she performed housework, walked three miles, rode a jet-ski and four-wheeler, and fixed her daughter's hair. During the hearing, the claimant raised her body off of the chair by using her hands. She continuously fanned herself with her left hand while wearing a left wrist splint. The wrist splint was clean, suggesting that it may not be worn very much. She appeared to move her wrist easily and appeared to have no pain or limitation of motion when reaching into her purse. In November 2002, well after the claimant alleged she became disabled, she dug a drainage ditch which she claimed was only six inches by two inches, inasmuch as admitting activities relating to gardening. She exhibited good lumbar spine range of motion and normal gait during a number of examinations. ...

(Tr. 20-21)

       Plaintiff attempts to debunk the ALJ's explanation by citing evidence of plaintiff's need for help completing certain

31

household chores and her inability to perform all chores in a

timely fashion; by questioning the amount of effort required to

fix her daughter's hair[5] or to dig a small drainage "ditch"; by

referring to her testimony that she only walked a mile and a half

a day, rather than three; and, by arguing that the ALJ jumped to

faulty conclusions when he deemed her to have admitted to

engaging in gardening activities, and when he questioned the

extent of her left wrist impairment by noting her use of that

hand during the hearing to raise herself out of her chair, to fan

herself, and to reach into her purse.  (Docket Entry No. 16 at

21-23)  While the undersigned would perhaps not recommend

upholding the ALJ's credibility finding if the standard of review

required that finding to be supported by a preponderance of the

evidence, it cannot be said that the above-quoted explanation

fails to amount to substantial evidence in support of the

credibility finding, nor was the ALJ unreasonable in relying upon

the relatively robust list of activities in which plaintiff

engaged or his own observations of plaintiff at the hearing.  It

is the ALJ's opportunity to make such observations which requires

this Court--which does not have that opportunity--to defer to his

reasonable and substantially supported findings related to

credibility, and neither the explanations themselves nor the

_____

[5]Plaintiff's counsel posits that this activity may have been as
uninvolved as pulling the hair back in a pony tail (Docket Entry No. 16 at
22); however, plaintiff reported to the psychological consultant that as of
April 2003, she still curled her daughter's hair (Tr. 159).

32

record as a whole are so questionable as to support a finding of reversible error.

Finally, the ALJ did not err in his consideration of plaintiff's mental impairment:  there is no dispute that plaintiff's psychological functioning during the relevant period was deemed only minimally compromised by her depression and anxiety with symptomatic treatment (Tr. 159-60, 226, 263, 265, 301-06), with scores on the Global Assessment of Functioning Scale between 65 and 75 during that period.  The ALJ's finding of plaintiff's RFC is reflective of that level of psychological functioning and thus substantially supported.

In sum, the undersigned must conclude that the decision of the Commissioner is supported by substantial evidence on the record as a whole, and is therefore deserving of affirmance.


### IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections

shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

     **ENTERED** this <u>22nd</u> day of February, 2008.

     <u>s/ John S. Bryant</u>
     JOHN S. BRYANT
     UNITED STATES MAGISTRATE JUDGE